**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| VALUE DRUG COMPANY, | : | |
| | : | |
| *Plaintiff – Counterclaim Defendant*, | : | Civil No. 3:23-cv-00263 |
| | : | Judge Stephanie Haines |
| | : | |
| v. | : | |
| | : | **ANSWER, NEW MATTER, and** |
| ONLY ONE HUB INC. a/k/a | : | **COUNTERCLAIM** |
| ONLY ONE HUB d/b/a | : | |
| PRIMUS HEALTHCARE, | : | |
| | : | |
| *Defendant – Counterclaim Plaintiff*, | : | |
| | : | |
| and | : | Filed on Behalf of Defendant – |
| | : | Counterclaim Plaintiff, |
| | : | Only One Hub Inc., d/b/a Primus |
| RICHARD HERSPERGER, | : | Healthcare |
| | : | |
| *Defendant.* | : | Attorney For Only One Hub: |
| | : | |
| | : | Amy L. Thomas, Esquire |
| | : | Supreme Court I.D. #318682 |
| | : | 100 W High Street |
| | : | Ebensburg, PA  15931 |
| | : | Phone:  (724) 317-1070 |
| | : | |
| | : | |

**<u>JURY TRIAL DEMANDED</u>**

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| VALUE DRUG COMPANY, | : | |
| | : | |
| *Plaintiff – Counterclaim Defendant*, | : | Civil No. 3:23-cv-00263 |
| | : | Judge Stephanie Haines |
| | : | |
| v. | : | |
| | : | |
| ONLY ONE HUB INC. a/k/a | : | |
| ONLY ONE HUB d/b/a | : | |
| PRIMUS HEALTHCARE, | : | |
| | : | |
| *Defendant – Counterclaim Plaintiff*, | : | |
| | : | |
| and | : | |
| | : | |
| RICHARD HERSPERGER, | : | |
| | : | |
| *Defendant*. | : | |

## <u>NOTICE TO DEFEND</u>

You have been sued in court.  If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this Answer, New Matter, and Counterclaim and Notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you.  You are warned that if you fail to do so, the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the Counterclaim or for any other claim or relief requested by the Plaintiffs.  You may lose property or other rights important to you.

**YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW.  THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.**
        **IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.**

Lawyer Referral Service
Blair County Bar Association
Blair County Law Library
Blair County Courthouse
423 Allegheny Street, 3rd Floor
Hollidaysburg, PA 16648
Telephone: (814) 822-0332

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| VALUE DRUG COMPANY, | : | |
| | : | |
| *Plaintiff – Counterclaim Defendant,* | : | Civil No. 3:23-cv-00263 |
| | : | Judge Stephanie Haines |
| | : | |
| v. | : | |
| | : | |
| ONLY ONE HUB INC. a/k/a | : | |
| ONLY ONE HUB d/b/a | : | |
| PRIMUS HEALTHCARE, | : | |
| | : | |
| *Defendant – Counterclaim Plaintiff,* | : | |
| | : | |
| and | : | |
| | : | |
| RICHARD HERSPERGER, | : | |
| | : | |
| *Defendant.* | : | |

## ANSWER

AND NOW comes Defendant, Only One Hub, Inc. d/b/a Primus Healthcare (hereinafter "OOH"), by and through its legal counsel, and avers as follows:

1.      Upon the information and belief of OOH, Paragraph 1 is Admitted.

2.      Upon the information and belief of OOH, Paragraph 2 is Admitted.

3.      It is admitted that Value Drug holds itself out as a pharmaceutical wholesaler that provides the services listed in Paragraph 3, however, OOH is without sufficient information to admit or deny what those programs are designed to do.

4.      Admitted in part and denied in part. It is admitted that OOH is a Wyoming corporation registered to do business in Pennsylvania as a foreign business corporation. However, the office address listed in Paragraph 4 is incorrect.  By way of further response, OOH maintains an office location in Pennsylvania at 100 W High Street, Ebensburg, Pennsylvania 15931.

5.      Admitted in part and denied in part.  It is admitted that Richard Hersperger is the Chief Executive Officer of OOH, however, it is denied that Mr. Hersperger has a business address at the address listed in Paragraph 5.

6.      It is admitted that some of the pharmacies that participated in the collaborative Covid-19 testing project are located in Blair County.

7.      Paragraph 7 is admitted in part and denied in part.  It is admitted that OOH maintains a Pennsylvania office, regularly conducts business in Pennsylvania, and is registered to do business in Pennsylvania. It is denied that Richard Hersperger is a resident of Pennsylvania. By way of further response, Hersperger is a resident of Florida.

8.      Paragraph 8 is admitted.

9.      Paragraph 9 contains legal conclusions which are denied. It is specifically denied that OOH or Hersperger engaged in any tortious conduct or mismanagement and that they breached any contract associated with the collaborative Covid-19 testing project (hereinafter the "Project").

10.      Admitted.

11.      Paragraph 11 is admitted in part and denied in part.  It is admitted that a third-party biller, who was a party to the Second Project Agreement was responsible for submitting testing claims to third-party payers and ensuring that claims were paid. It is also admitted that a second third-party biller, that was not a party to any of the Project Agreements, was responsible for submitting testing claims.  It is specifically denied that OOH was responsible for selecting the third-party billers.  By way of further response, representatives from VDC Drug Company (hereinafter "VDC") were directly involved in the selection and approval process for the billing companies and VDC's member pharmacies were responsible for collecting complete and accurate insurance information from the patients to ensure that the claims could be properly billed.

12.    Paragraph 12 is denied.  It is specifically denied that OOH or Hersperger engaged in any misfeasance or unlawful conduct.  It is further denied that OOH or Hersperger failed to properly submit Project claims; failed to obtain reimbursements for Covid-19 tests; used improper billing codes; failed to properly segregate payments; failed to properly distribute funds; failed to provide adequate reporting; failed to make payments; or made misrepresentations or material omissions related to the Project.

13.    Paragraph 13 is admitted in part and denied in part. It is admitted that OOH provided VDC with a report dated August 15, 2023 that showed reimbursements of $797,295.06 as of that date.  It is denied that the total claims were valued at $5,796,030.00 or that 86.2% of the claims were not billed as of that date. By way of further response, all of the Covid-19 testing claims for which accurate insurance and demographic information had been obtained were submitted to the third-party payers by August 15, 2023.  Any implication that the failure to collect additional reimbursements from third-party payers was due to any fault of OOH or Hersperger is denied.

14.    Paragraph 14 is denied.  By way of further response, OOH provided Greg Drew, of VDC, with a report of all of the payments that were made to VDC pharmacies.

15.    OOH is without sufficient information to determine how VDC calculated the total that it asserts is owed by OOH.  Accordingly, Paragraph 15 is denied.  By way of further response, OOH paid some of VDC's member pharmacies more than what was received from third-party payers for the claims originating from those pharmacies. Due to bad faith on behalf of several of the major health insurance companies, which have repeatedly underpaid, denied, or clawed back the funds received for the Project claims, OOH has paid out more to VDC's member pharmacies than it has received in reimbursements.

16.    Paragraph 16 is denied.  It is denied that VDC has attempted to work cooperatively with OOH. To the contrary, VDC executives were often hostile towards OOH and have continually

tried to blame OOH for issues that arose with the Project. VDC actively blocked OOH from reaching out to the pharmacies to resolve the issues with their failure to collect and verify patient insurance and demographic information. VDC also refused to direct their member pharmacies to scan patient insurance identification cards despite the fact that this information was vital to ensure successful claims processing. VDC executives made no effort to comprehend the difficult process of obtaining payment on Project claims, and instead repeatedly and unfairly projected the blame onto OOH and Hersperger.

## FACTUAL BACKGROUND

17.     Paragraph 17 is admitted.

18.     Paragraph 18 is admitted.

19.     Paragraph 19 is admitted in part and denied in part.  It is admitted that Hersperger reviewed the Medicare rate schedule and determined that $100 was the approximate rate that Medicare was currently reimbursing providers for Covid-19 PCR testing. Any implication that Hersperger represented that the Project was guaranteed to generate this reimbursement amount per claim is denied.

20.     Paragraph 20 is admitted in part and denied in part.  It is admitted that based upon the information available to the parties at the time that they signed the Project Agreement, it appeared to be more advantageous to the pharmacies to partner with a physician to increase the reimbursement rates through an asynchronous office visit code rather than the pharmacy seeking reimbursement on its own.

21.     Paragraph 21 is denied.  It is specifically denied that OOH had any responsibility to manage the Project or was solely responsible for managing the billing company.  It was the agreement of all parties that the Project was to be a fully collaborative effort.  OOH and VDC had

weekly meetings to discuss project details and VDC retained control over access to the pharmacies. By way of further response, the Project Agreement speaks for itself in terms of the roles that each party had. By the end of the Project, OOH was the only party attempting to mitigate the losses caused by the pharmacies, the billing companies, and the health insurance companies.

22.     It is admitted that it was the responsibility of the pharmacies to assist patients with the following: verifying correct insurance and demographic information, including uploading insurance card images; providing instructions to patients for the tests; using proper sampling procedures; collecting test samples; and submitting the test samples to the laboratory using proper packaging. Any implication that these responsibilities were always completed properly is denied.

23.     Paragraph 23 is admitted in part and denied and part. It is admitted that OOH agreed to provide relevant software and testing kits to VDC. It is also admitted that VDC would provide those testing kits to its pharmacies. It is admitted that VDC agreed to recommend the Project to its pharmacies. However, it is denied that VDC recommended the Project to all of its pharmacies.

24.     Paragraph 24 is denied. It is denied that OOH or Hersperger made any such statements.

25.     Paragraph 25 is admitted in part and denied in part. It is admitted that OOH advertised the Project first by television advertisements, and then through directed internet advertisements. It is also admitted that OOH provided a tablet to any pharmacy that wanted one. Had all parties appropriately participated in the Project and fulfilled all of their responsibilities relating to the Project, it could have maximized revenue generation for the pharmacies.  Further, it is admitted that OOH provided software that served as the platform for the Project.  Any implication that OOH did not fulfill any of these duties is denied.

26.     OOH cannot speak to the specific reasons as to why VDC decided to participate in the Project. All parties discussed the idea and agreed to sign on. Accordingly, Paragraph 26 is denied.

27.     Paragraph 27 is denied. It is denied that Triple B Billing & Consulting (hereinafter "Triple B") was ever selected to provide billing services for the Project or that they ever provided any such services.

28.     Paragraph 28 is denied. Triple B is not the in-house billing services provider for Dr. Kastelic.

29.     Paragraph 29 is admitted in part and denied in part. It is admitted that in May 2021, a draft of the agreement for the Project was circulated which included Genotox Laboratories, VDC, OOH, Triple B, physicians who are clients of Triple B, and pharmacies who are members of VDC. It is also admitted that the draft of the Project agreement that was circulated is attached to Plaintiff's Complaint as Exhibit A. It is denied that this agreement, in the form included at Exhibit A, was ever finalized or signed by all parties.

30.     It is admitted that the first Paragraph of the draft agreement attached to the Complaint at Exhibit A states that Physicians would be all clients of Triple B and that pharmacies would be members of VDC.

31.     Paragraph 31 is admitted in part and denied in part. It is admitted that several pharmacies introduced the Covid-19 tests in June 2021, however, the Project Agreement was not finalized and signed until November 2, 2021.

32.     Paragraph 32 is admitted in part and denied in part. It is admitted that in June 2021 VDC began providing the test kits to its pharmacies, and that the pharmacies began conducting patient assessments, collecting test samples, providing instructions, and submitting the tests to the laboratory. However, it is denied that the pharmacies appropriately conducted the patient

assessment for all tests. By way of further response, many of the records were missing critical insurance and demographic information that should have been collected and/or verified during the patient interviews at the pharmacies.

33.     Paragraph 33 is admitted in part and denied in part. It is admitted that some patients signed up using the registration database created by OOH online, and that other patients were registered by telephone, or directly at the pharmacy. It is admitted that the pharmacies were trained and instructed to verify and/or collect all the registration information from the patients, including current, accurate insurance and demographic information. It is admitted that the information in the patient registration database was shared with Genotox Laboratories and OOH. It is also admitted that that information was shared with the billing companies. It is denied that OOH and/or Hersperger were responsible for managing, processing, and paying claims using the patient registration database in June 2021.

34.     Paragraph 34 is denied. OOH is without sufficient information to know what internal conversations were had by VDC employees in August 2021. The email attached to the Complaint as Exhibit B is a self-serving document controlled exclusively by Plaintiff, the contents of which speak for itself. Any implication that there were any problems or concerns with OOH and/or Hersperger's role as a Project partner is denied.

35.     Paragraph 35 is admitted in part and denied in part. It is admitted that VDC and OOH had continuing conversations as part of the Project about things that were working and things that were not working. It is denied that VDC was the only party that had issues with things that were ongoing. Both parties had issues with things that the other Project partners were allegedly doing or not doing.

36.     Paragraph 36 is denied. It is specifically denied that Hersperger or any other OOH executive lacked an understanding of independent pharmacy operations or HIPAA compliance;

that OOH and/or Hersperger identified themselves as VDC consultants; or that the Project database was primitive and not HIPPA compliant.  It is further denied that there was an issue with test kit supply; that there was any fault on the part of OOH in supplying test kits to VDC; that there was a lack of staffing; or that there were inadequate safeguards to protect patient data for the Project. By way of further response, all of the VDC pharmacies always had the necessary test kits to complete the tests in the pharmacies.

37.    Paragraph 37 is denied as stated.  It is denied that there were any legitimate issues or concerns with the Project database – particularly with patient data security or privacy. It is denied that any VDC employee ever fixed the Project database and that it would have been necessary for them to do so. By way of further response, there were times that VDC executives suggested changes to the database relating to how patient information was displayed, but when Hersperger updated the system to address VDC's changes, VDC, on behalf of the pharmacies requested that Hersperger remove the update. In addition, all persons with access to the database (and thus, patient information), were covered entities who were all required to protect the patient data.

38.    Paragraph 38 is denied.  The pharmacies were able to go in and view the patient information, if there were instances when information was linked to the wrong patient, this was the result of the pharmacy choosing the wrong patients. Hersperger did add the date of birth at the end for an additional identifier, but data entry mistakes did occasionally occur. Richard responded to all concerns about this by making adjustments to the database as the Project went on.

39.    Paragraph 39 is denied. Hersperger spoke to VDC's IT department and they represented that they were unable to assist with making improvements to the database. The VDC IT member made some suggestions, but those methods were already being implemented by OOH.

40.    Paragraph 40 is denied. It is denied that VDC spent any time or manhours ensuring that the database was HIPAA compliant. By way of further response,  Hersperger had one telephone call with someone in VDC's IT department and they represented that they were unable to assist with making improvements to the database. VDC did not do anything to bring the database into HIPAA compliance and did not rebuild the database in any way.

41.    Paragraph 41 is denied as stated. It is specifically denied that there were serious data, security, or privacy issues with the database. By way of further response, VDC's own IT department confirmed that OOH's database was already HIPAA compliant. VDC requested numerous changes to the database that Hersperger routinely made. VDC often requested that Hersperger reverse the change.

42.    Paragraph 42 is admitted in part and denied part. It is admitted that proper data capture and validation was imperative for clean, effective claim billing. However, it is denied that there was any error or flaw in the database that resulted in patient information not being properly captured. By way of further response, it was the responsibility of the pharmacies that actually met with the patients face-to-face to verify and record this information.

43.    Paragraph 43 is admitted in part and denied part. It is admitted that Hersperger, on behalf of OOH, was continually updating and enhancing the database. It is denied that Hersperger seldom made fixes or enhancements to the database.

44.    Paragraph 44 is denied in part and admitted in part. It is admitted that OOH and Hersperger believed that it was the pharmacists who were to blame for not validating/ incorrectly capturing patient information, including vital insurance and demographic information. It is denied that there is no legitimacy to that claim. It is further denied that it was the responsibility of OOH and/or Hersperger to validate patient information. It was the individual pharmacists who directly met with the patients, and who regularly validate patient insurance information as a routine part of

their ordinary course of business. It is further denied that OOH or Hersperger were solely responsible for selecting the billing companies. By way of further response, the pharmacists and pharmacy staff were trained to collect insurance information and were specifically requested to capture an image of the insurance card for each patient – an instruction to do this was on the front page of the database and in the training materials.

45.     It is denied that Hersperger or any OOH executive would create additional databases of information that needed to be validated. By way of further response, it was responsibility of the pharmacies at the time of the patient interview to confirm all patient information and capture an image of the patient's insurance ID card.

46.     Paragraph 46 is denied. It is specifically denied that OOH did not provide formal training to the pharmacists or that they did not train the pharmacists on collecting patient information. By way of further response, OOH provided a manual on the Project to every pharmacy and held in-person training at each of the pharmacy locations with the pharmacists and their staff, which included this information.  Further, it is a routine part of the job of the pharmacist and their staff to collect patient insurance information so that they can bill the patient's insurance and get paid as part of the regular course of business.

47.     Paragraph 47 is denied as stated. It is admitted that OOH provided the pharmacies with information that included topics such as registration talking points, testing procedures, and further instructions. It is denied that these instructions were primitive or that they did not fully explain the procedures for the Project. By way of further response, OOH also provided in-person training at each of the pharmacies.

48.     Paragraph 48 is admitted in part and denied in part. It is admitted that VDC requested that OOH provide them with a training video. It is denied that OOH refused to provide a training video. At some point, VDC requested that OOH provide a training video which OOH

executives agreed to provide, however, VDC wanted the video completed immediately and were unwilling to wait more than one week for turnaround on the video. OOH laid out all content for the video including step-by-step instructions, artwork, and b-roll.

49.    Paragraph 49 is denied in part and admitted in part. It is admitted that there was never a training video provided by OOH to VDC. However, it is denied that any such training video was necessary as the training already provided to the pharmacies by OOH was sufficient for the pharmacies to complete all necessary Project steps. It is further denied that Hersperger ever There were also written instructions left at each pharmacy which included step-by-step directions on all aspects of the process.

50.    Paragraph 50 is denied. VDC did ultimately make their own training video, which was unusable, as the VDC video was primitive and contained incorrect instructions for the pharmacies.

51.    Paragraph 51 is admitted in part and denied and in part. It is admitted that there were issues with claim submission, billing, and payment. Any implication that those issues were the fault of OOH is denied.

52.    Paragraph 52 is denied. The first claims for the Project were billed in November of 2021. Any implication that this was the result of any fault on the part of Hersperger and/or OOH is denied.

53.    Paragraph 53 is denied. It is denied that Triple B was ever the biller for the Project. By way of further response, the parties consulted with Triple B about possibly serving as the Project biller, however, Triple B never served in that capacity.

54.    Paragraph 54 is denied. It is specifically denied that any issues with the billing resulted from any conduct of OOH or Hersperger.

55.     Paragraph 55 is denied. It is specifically denied that OOH or Hersperger provided inadequate information to Triple B or any other billing company.

56.     Paragraph 56 is denied in part and admitted in part. It is denied that VDC objected to or made additional recommendations regarding billing codes, or to using Dr. Kastelic, who was OOH's Medical Director for Pennsylvania, to bill for the Project. By way of further response, the selection of codes for the claims that were submitted and the method by which the claims were submitted was done at the recommendation of the third-party billing company – who held themselves out to have extensive experience billing Covid-19 claims – that was responsible for billing Project claims. It is admitted that Project claims were commingled with claims from Dr. Kastelic's office at the beginning of the Project. By way of further response, the cause of the commingling of the claims payments was due to the recommendation of the billing method made by MSA.  Any implication that this commingling was the fault of OOH or Hersperger is denied.

57.     Paragraph 57 is admitted in part and denied part. It is admitted that VDC was not directly responsible for Project billings. However, VDC was consulted and had the opportunity to weigh in on billing codes and claim submission procedures. It is denied that OOH adopted improper billing practices or that OOH and/or Hersperger insisted on any improper billing practices. By way of further response, OOH and its executives acted on the advice of the billing companies who worked on the Project and who advertised themselves as experienced with Covid-19 claims.

58.     Paragraph 58 is denied. It is denied that Triple B Billing was ever the biller for the Project.

59.     Paragraph 59 is denied. It is denied that Hersperger ever made such a representation to VDC.

60.     Paragraph 60 is denied.  It is denied that any such representation was ever made.

61.     It is admitted that the Project agreement attached to Plaintiff's Complaint at Exhibit C was signed in October 2021 by the parties listed.

62.     It is admitted that the first Paragraph of the agreement states that all physicians would be clients of MSA or OOH and that all pharmacies would be members of VDC.

63.     It is admitted that the terms of the draft Project agreement attached to Plaintiff's Complaint as Exhibit B is the same as the terms of the Project agreement attached to Plaintiff's Complaint as Exhibit C. By way of further response, only Exhibit C was a final, signed agreement.

64.     Paragraph 64 is admitted.

65.     Paragraph 65 is admitted.

66.     Paragraph 66 is admitted.

67.     Paragraph 67 is admitted.

68.     It is admitted that under the revenue share and clearinghouse section of the Project agreement that VDC was entitled to up to 28.6% of gross revenues received by the pharmacies, which VDC would bill to the pharmacies monthly, and which was to be collected from the pharmacies.

69.     It is admitted that under the revenue share and clearinghouse section of the Project agreement that OOH was entitled to no more than 25% of gross receipts from services rendered to pharmacies by VDC, for which OOH was to bill VDC monthly.

70.     It is admitted that the breakdown listed in Paragraph 70 was contemplated under the revenue share and clearinghouse section of the Project agreement.

71.     It is admitted that under the revenue share and clearinghouse section of the Project agreement, the billing company was to develop an escrow agreement and account for the deposit of project revenues; the billing company would act as a clearinghouse to provide billing collection, reporting, and disbursement, and that the clearinghouse would generate payment of invoices to all

parties. It is denied that any such escrow agreement or account were ever created by any of the third-party billing companies.

72.     Paragraph 72 is admitted.

73.     Paragraph 73 is admitted in part and denied part. It is admitted that the individual member pharmacies did not sign either Project agreement. It is denied that a contract was established between the individual pharmacies and OOH during the patient registration process. By way of further response, VDC executives John DeJames and Walt McCullough were insistent that they did not want individual agreements between OOH and the pharmacies.

74.     It is admitted that there were numerous issues with MSA as the Project biller.

75.     Paragraph 75 is admitted in part and denied in part. It is admitted that VDC and OOH had weekly calls related to the Project; however it is denied that this was due to any concerns on the part of VDC.

76.     It is admitted that at some point during the Project, VDC suggested that they switch to Plenum MD as the biller.

77.     Paragraph 77 is admitted.

78.     Paragraph 78 is denied.

79.     Paragraph 79 is admitted.

80.     Paragraph 80 is denied as stated. It is admitted that the parties had a meeting and that both parties expressed concern for the current billing company. It is denied that Hersperger or any OOH representative was not concerned.

81.     Paragraph 81 is admitted in part and denied in part. It is admitted that OOH and Hersperger believe that some of the issues arising from the lack of payment or caused by the third-party biller. However, it is denied that OOH and Hersperger was were responsible for the lack of payments. By way of further response, OOH and Hersperger also believed that the blame for the

lack of payment also lies with the pharmacies who did not collect accurate insurance and demographic information and the health insurance payers who were denying claims in bad faith.

82.     Paragraph 82 is admitted in part and denied in part. It is admitted that around this time OOH and VDC looked for a new biller for the Project. It is denied that Hersperger or any OOH executive selected MedWave Billing and then informed VDC after the fact. By way further response VDC, specifically Greg Drew, was directly involved with selecting MedWave Billing as the new biller for the Project.

83.     It is admitted that MSA only processed approximately 40% of the Project claims.

84.     Paragraph 84 is denied. It is denied that issues with billing and payment were caused by OOH or Hersperger. It is further denied that OOH or Hersperger engaged in any mismanagement or unlawful conduct. It is denied that Hersperger or OOH encouraged or persuaded MSA to use incorrect billing codes. By way further response, all the parties to the agreement relied on the expertise of as an experienced biller for Covid-19 testing claims.

85.     Paragraph 85 is denied. It is specifically denied that OOH or Hersperger did not provide MSA with all the records necessary to properly bill the claims.

86.     Paragraph 86 is admitted in part and denied part. It is admitted that Hersperger on behalf of OOH provided MSA with everything it needed to successfully submit the testing claims. It is denied that OOH had to obtain a national provider identifier to rebill claims. By way of further response, on the advice of the billing company, it was recommended that OOH have a separate NPI to bill these claims.

87.     It is denied that Hersperger or OOH had any obligation to provide VDC with a comprehensive document relating to Project billing. By way of further response, it was the responsibility of the biller under the Project agreement to take care of Project billing. It is further denied that Hersperger on behalf of OOH represented that he was working on such a document.

88.    Paragraph 88 is admitted in part and denied part. It is admitted that MedWave became the new Project biller. It is denied that MedWave was selected only by OOH or Hersperger. By way of further response, VDC was directly involved in the selection of MedWave and specifically approved MedWave. OOH has no way of knowing whether VDC executives were excited or not excited about changing billing companies. It is further denied that OOH or Hersperger had no intention of trying to resolve the issues with MSA. By way of further response, OOH attempted to resolve these issues with MSA on numerous occasions, but, the issues were ultimately not able to be overcome and all parties determined that it was in the best interest of the Project to move on to a new biller.

89.    Paragraph 89 is denied. It is denied that Hersperger made these representations to VDC. By way of further response, MedWave representatives made this representation to VDC.

90.    Paragraph 90 is denied.

91. Paragraph 91 is admitted.

92.    Paragraph 92 is denied. It is denied that OOH maintained management control over billing or assumed many of the billing functions during the time that the third-party builders were working on the Project.

93.    It is admitted that the HRSA claims program ended on March 22, 2022. It is admitted that at some point prior to the date OOH informed VDC that the program would be ending.

94.    Paragraph 94 is admitted in part and denied part. It is admitted that Hersperger on behalf of OOH represented that MedWave had submitted all the HRSA claims appropriately. It is also admitted that this information was based on what was directly told to Hersperger by MedWave. It is denied that any such representation was false.

95.     Paragraph 95 is denied as stated. It is admitted that at some point OOH executives learned that MedWave had not appropriately billed the claims to HRSA. OOH is without sufficient information to know whether a representation was made that the claims were stuck in HRSA, however, any such representation that was made would have been made based upon the information provided to OOH by MedWave.

96.     Paragraph 96 is denied. It is denied that OOH or Hersperger caused any delay in billing of HRSA claims. By way of further response, the HRSA program very quickly ran out of money to pay for Covid-19 claims and to date, the program has not been refunded by government officials. In addition, even if all claims have been properly submitted to HRSA by the third-party billing companies, it is unlikely that they would have paid due to a lack of funding for the program.

97.     Paragraph 97 is admitted in part and denied in part. It is admitted that when MedWave took over as the new billing company there were discussions among the participants of the Project as to the appropriate billing codes to use. It is also admitted that OOH executives represented to VDC that the billing company wished to use billing code 99214, but that OOH was hesitant to use this code. By way of further response OOH believed that the more appropriate billing code would be 99213. Further, VDC specifically approved the use of billing code 99213.

98.     Paragraph 98 is denied. It is specifically denied that VDC advised OOH executives that 99214 was not an appropriate billing code. By way of further response, VDC specifically wanted to use billing code 99214, but OOH believed that 99213 was the more appropriate code.

99.     Paragraph 99 is denied as stated. VDC executives wanted to use billing code 99214 however, they ultimately agreed to 99213 as the more appropriate and conservative billing code.

100.    It is denied that OOH used any improper billing codes or that VDC had objections to the billing codes used. By way of further response, the parties all discussed potential billing

codes that were suggested by the new billing company and came to agreement as to use of these codes.

101.    Paragraph 101 is denied. It is denied that billing code 99214 had anything to do with the mini-audit by UPMC. By way of further response, UPMC's audit and ultimate rejection of claims was related to the billing codes used by the previous biller, MSA.

102.    Paragraph 102 is admitted in part and denied part. It is admitted that some of the payments made were as low as $49. It is denied that Hersperger or any OOH executive made a representation that payments would be $100 for every claim. By way of further response, claim payments that were lower than $100 due to errors and/or bad faith on the part of health insurance payers who incorrectly processed the payments, denied the payments, or applied inappropriate co-pays and deductibles to the claims.

103.    OOH is without sufficient information to admit or deny VDC's expertise with claims processing. Accordingly, the averments of Paragraph 103 are denied.

104.    Paragraph 104 is admitted in part and denied in part. It is admitted that if claims include all the correct information and are submitted in a timely manner that some payments can be made within 15 to 35 days of submission. It is denied that Hersperger or any OOH executive represented that claims payments for the Covid-19 testing claims would be made between 15 to 35 days.

105.    Paragraph 105 is denied. It is specifically denied that OOH or Hersperger insisted on using incorrect billing codes and that this was the reason for any rejection of claims. By way of further response, billing codes were chosen based on the expertise of the third-party billing companies and such billing codes were discussed and agreed-upon by all parties to the agreement.

106.    Paragraph 106 is denied.

107.    Paragraph 107 is admitted in part and denied part. It is admitted that some claims were denied based on untimeliness. It is denied that OOH and Hersperger were responsible for these claim denial or the timing of the claim submission. By way of further response, a large amount of the claims that were denied as untimely were improperly denied under the guidelines issued by the federal government related to Covid-19 claims.

108.    Paragraph 108 is a admitted part and denied in part. It is admitted that at some point during the Project, the parties discussed becoming in-network with certain third-party payers prior to submitting claims. However, it was discovered by the parties that it was more advantageous for OOH to remain out-of-network related to Covid-19 claims as the average reimbursement rate for out-of-network claims was higher than the average reimbursement rate for in-network claims.

109.    It is denied that representations made relating to network status were false. By way of further response, these representations were made based upon information available to the parties at the time.

110.    It is admitted that some patients, mostly those with a form of Blue Cross Blue Shield health insurance have received direct payments for Covid-19 tests. It is also true that OOH sent collection letters to a number of these patients requesting the reimbursements. By way of further response, there were a number of VDC employees who directly received payment for the tests. Despite the fact that VDC was a party to the agreement and knew that payment for these tests should have gone to the pharmacies, VDC did nothing to encourage its employees to forward these reimbursements to OOH or the pharmacy where the test took place.

111.    OOH is without sufficient information to know VDC's experience relating reimbursements to patients. Accordingly, Paragraph 111 is denied.

112.    Paragraph 112 is denied as stated. The direct payment of Project patients was a result of improper claim payment practice by Blue Cross Blue Shield, and not the fault of Only One Hub dba Primus Healthcare.

113.    Paragraph 113 is denied. Is specifically denied that OOH's performance relating to the Project was deficient.

114.    Paragraph 114 is denied by way of further response.  MedWave ceased being the biller for the Project in October 2022.

115.    Paragraph 115 is denied that OOH represented that MedWave failed to collect any funds relating to the Project.

116.    Paragraph 116 is denied. It is specifically denied that MedWave's inability to appropriately collect funds was due to OOH or Hersperger's conduct.

117.    Paragraph 117 is denied. It is specifically denied that it was OOH's responsibility or obligation to secure a confident billing provider. By way of further response, VDC directly vetted and approved MedWave to be the billing company.

118.    It is admitted that OOH performed billing services for the Project in-house after MedWave was no longer the Project biller.

119.    VDC's interpretation of the Revenue Share and Clearinghouse provision of the Project Agreement is denied.

120.    Paragraph 120 is denied.  it is denied that OOH took over handling collection and disbursement of Project funds in January 2022.

121.    Paragraph 121 is denied.

122.    Paragraph 122 is denied.

123.    Paragraph 123 is denied in part and admitted in part.  It is admitted that an account was established at the instance of VDC, but it is denied that Project funds were to be deposited

into the account. By way of further response, the purpose of the account was to deposit funds from MedWave's special claims projects.

124.    Paragraph 124 is denied. It is denied that such an account was required under the Project agreements.

125.    Paragraph 125 is denied.

126.    Paragraph 126 is denied. It is denied that Hersperger or any OOH executive represented that normal Project funds would be deposited into an escrow account at First Commonwealth Bank. By way further response the escrow account at first Commonwealth Bank was specifically for a special Project with MedWave to distribute funds relating to their claims Projects with the health insurance payers.

127.    Paragraph 127 is denied. By way further response, VDC had access to this account at all times.

128.    Paragraph 128 is admitted in part and denied part. It is admitted that Project funds were not deposited into the escrow account. However, it is denied that there was any obligation to do so.

129.    OOH is without sufficient information to know what information VDC does or does not know. The parties had discussions at various times during the Project and agreed that the escrow account was not required.

130.    Paragraph 130 is denied. It is specifically denied that OOH and its executives have failed to provide VDC with information concerning the Project. By way of further response, OOH provided VDC with information and reports on numerous occasions. VDC also had access to reports in real-time on the OOH portal.

131.    Paragraph 131 is admitted in part and denied in part. It is admitted that there were ongoing issues related to payment for Project claims. It is denied that OOH was not resolving or

attempting to resolve those issues. Any implication that VDC was not aware of these ongoing efforts to resolve the issues is denied.

132.    Paragraph 132 is denied. OOH cannot speak to VDC's goals in certain behaviors, but it is denied that VDC sought to work collaboratively with OOH or in good faith. By way of further response, VDC executives were often very hostile towards OOH, which made collaborative work on the Project very difficult.

133.    Denied. It is specifically denied that OOH or any of its executives stymied collaborative efforts.

134.    It is denied that Hersperger on behalf of OOH failed to provide VDC with requested information or updates or that his responses were inadequate or incomplete. By way further response, Hersperger provided VDC with all information available to him at the time.

135.    Paragraph 135 is denied. It specifically denied that OOH or Hersperger intentionally ignored any information request from VDC.

## CAUSES OF ACTION
### COUNT I

136.    Paragraph 136 is denied.

137.    Paragraph 137 is admitted.

138.    Paragraph 138 is admitted. By way of further response OOH made prepayments to pharmacies for tests in order to compensate the pharmacies for the delay in claim payments.

139.    Paragraph 139 is denied it is denied that refused to provide adequate details as to how prepayments would be reconciled with Project payments. By way further response Value was aware that any prepayments made would be subtracted from Project payments that were made.

140.     Paragraph 140 is admitted in part and denied part. It is admitted that OOH has provided reports and responses to Value upon request. It is denied that OOH has provided only limited information. By way of further response, Value has been hostile towards OOH and has on several occasions made unreasonable demands for information rather than working with the OOH.

141.     Paragraph 141 is denied. It is denied that OOH or Hersperger have been unwilling to act collaborative collaboratively with Value or provide adequate information. By way of further response, OOH has continually provided updates to Value and let them know what has been going on with the Project. OOH executives have also requested from Value on a number of occasions that it assist OOH in contacting the healthcare payers to attempt to collect payment on the Project. Value refuses to accept the fact that the number one factor as to why the parties have not received reimbursement is due to bad faith and/or mistake on the part of the healthcare payers. Instead, Value would rather point finger at OOH or Hersperger.

142.     Paragraph 142 is denied. It is specifically denied that OOH or Hersperger have repeatedly refused to provide Value with this information. By way of further response, OOH and Hersperger have reported on multiple occasions that they are having difficulty obtaining reimbursement from the health insurance companies. Until the payments are made by the payers, distribution cannot be made to the pharmacies.

143.     Paragraph 143 is denied. It is specifically denied that OOH's conduct is unacceptable or that it was improper or unlawful in any way.  It is further denied that any delay in Project payment has been caused by OOH. By way of further response, OOH has communicated to Value on numerous occasions that they are having incredible difficulty obtaining Project payments from health insurance companies. OOH has requested assistance

from Value in a obtaining reimbursement from health insurance payers, but Value has consistently refused to do so.

144.    Paragraph 144 is admitted in part and denied part. It is admitted that as of late March 2023 there were approximately 45,000 claims that had not been paid. It is denied that Hersperger or any other representative asserted that the claims were guaranteed to generate $100 per claim. Any implication that OOH has not done everything within its power to attempt to get these claims paid is specifically denied.

145.    Denied. OOH has provided Value with a report of tests conducted per pharmacy and prepayments made per pharmacy.

146.    Paragraph 146 refers to reports that are attached to plaintiff's Complaint. The contents of those documents speak for themselves.

147.    Paragraph 147 refers to reports that are attached to plaintiff Complaint. The contents of those documents speak for themselves.

148.    Paragraph 148 refers to reports that are attached to plaintiffs Complaint. The contents of those documents speak for themselves.

149.    OOH is without sufficient information to determine how Value calculated this figure. Accordingly, such averment is denied.

150.    Paragraph 150 is admitted. By way of further response nothing in the Project agreement precludes the parties from having similar arrangements with other third parties.

151.    Paragraph 151 is denied. OOH has repeatedly informed Value that they have agreements with other pharmacies that are not Value pharmacies. Value has repeatedly been provided and still has access to the software to be aware of which claims are for Value pharmacies.

152.    Paragraph 152 is denied. OOH has repeatedly told Value that all claims with valid insurance information have been billed to date. By way of further response, the number of claims that have not been billed would not be included on such reports.

153.    Paragraph 153 is denied. OOH has repeatedly discussed with Value why such a low percentage of claims has been paid to date. By way of further response, the reason for such a low percentage of claims being paid is related to the fact that the majority of the health insurance companies, have acted in bad faith in denying the Covid-19 testing claims; in addition, a large number of claims are missing vital patient insurance and demographic information that should have been collected at the pharmacy level when the test was performed. Without this vital information, no billing company can bill these claims.

154.    Paragraph 154 is denied. OOH has provided Value with the distribution of what payments have been made to date.

155.    Paragraph 155 is admitted in part and denied in part. It is admitted that OOH has not placed funds into the escrow account that Value references. It is denied, however, that OOH has any obligation to do so. By way of further response, the escrow account was specifically created for funds from the claims Projects that MedWave was supposed to have been working on.

156.    Paragraph 156 is admitted in part and denied in part. It is admitted that Value and its member pharmacies, along with OOH, or title to payments for completed once those payments were received from the health insurance companies. It is denied, however, that Value or the pharmacies are owed any payments on testing claims for which payment was not received from the insurance company.

157.    Paragraph 157 is denied. It is denied that any of OOH's conduct has caused the lack of progress with payments from the health insurance companies. By way of further

response, Value executives have been incredibly hostile and have refused to participate in the Project and assisting OOH in mitigating damages by assisting with the collection of funds. Instead, Value has decided to make unreasonable demands and pursue litigation instead of working with OOH, which only served to divert resources and cause further delays in collection of payment for Project testing claims.

158.    Paragraph 158 is admitted in part and denied in part. It is denied that Value was to receive 15% of Project proceeds. It is further denied that OOH or Hersperger have engaged in any unlawful or improper conduct, and that any conduct by these parties has resulted in a delay in claim payments being made. It is further denied that Value is owed payment on any claim for which a reimbursement has not been made by the health insurance company. It denied that OOH owes Value $869,404.50. It is admitted that Value has refused payment for the Project to date.

159.    Paragraph 159 is an incorporation Paragraph to which no response is required.

160.    Paragraph 160 is admitted in part and denied part. It is admitted that what VDC refers to as the second Project agreement was a valid and enforceable contract. It is denied that OOH was the party that breached this agreement. By way of further response multiple parties to the contract were unable to fulfill obligations under the contract leading to a frustration of the purpose of the contract and impossibility of performance by many of the parties under the agreement.

161.    Paragraph 161 is denied. It is denied that OOH material breached the second Project agreement or that they failed to perform the services that were to be rendered under the agreement. It is further denied that OOH failed to build HIPPA compliant software.  It is denied that OOH had an obligation to make a training video or failed to appropriately train the pharmacies. It is denied that OOH failed to provide tablets to any pharmacies that requested one.  It is denied that OOH did not appropriately advertise the Project. It is denied that OOH did not appropriately coordinate

marketing for the Project. It is denied that OOH did not ensure regulatory and other compliance rules.  It is denied that OOH did not provide adequate training materials.  It is denied that OOH did not provide biohazard containers to any pharmacy that needed them, and it denied that OOH did not create instructional handouts that were left at every pharmacy after training was completed.

162.    Paragraph 162 is denied. It is denied that OOH took an active role in billing for the Projects immediately or that they impeded the performance of MSA or MedWave. It is admitted, however, that OOH did become the exclusive biller for the Project in or around January 2023.

163.    Paragraph 163 is denied in part. It is denied that OOH prevented MSA or MedWave from performing or that they controlled or performed billing functions for the Project while MSA or MedWave was involved. It is admitted that at some point, OOH did take on responsibility for Project billing. The remainder of Paragraph 163 constitutes legal conclusions to which no response is deemed required. To the extent that a response is deemed required, the remainder of Paragraph 163 is denied.

164.    Paragraph 164 contains legal conclusions which are denied. It is specifically denied that OOH material breach material breached the second Project agreement or that they failed to provide adequate services. It is further denied that OOH had the obligation to provide the services to be rendered by the billing services provider under the Project agreement.

165.    Paragraph 165 contains a legal conclusion, which is denied. It is specifically denied that OOH materially breached the revenue sharing and clearinghouse provision of the second Project agreement or that they had any obligation to fulfill the services of the billing provider under this agreement.

166.    Paragraph 166 contains a legal conclusion which is denied. It is specifically denied that OOH had any obligation to perform clearinghouse functions under the Project agreement.

167.    Paragraph 167 is denied. Any obligation that OOH was required to perform such tasks under the second Project agreement is denied.

168.    Paragraph 168 contains a legal conclusion which is denied. It specifically denied that OOH has breached an obligation to work together with the parties.

169.    Paragraph 169 is denied. It is specifically denied that VDC has complied with all of its obligations and duties under the agreement.

170.    Paragraph 170 contains legal conclusions which are denied. It is specifically denied that VDC fully performed under the Project agreement or that the right to full performance has been satisfied, waved, or excused.

171.    Paragraph 171 contains legal conclusions which are denied. It is further denied that OOH has breached the second Project agreement or the VDC has incurred damages in excess of $50,000. It is further denied that VDC has suffered damages of $869,404.50 or that OOH is responsible for such alleged damages.

## COUNT II

172.    Paragraph 172 is an incorporation Paragraph to which no response is required.

173.    Paragraph 173 contains a legal conclusion which is denied. It is denied that the first Project agreement is a valid and enforceable contract.

174.    Paragraph 174 is denied. It is specifically denied that the first Project agreement was a valid and enforceable contract and, as detailed, *infra*, that OOH materially breached any of the provisions of that contract.

175.    Paragraph 175 is denied. It is specifically denied that OOH took an active role in billing for the Project almost immediately or that BBB was ever a biller for the Project.

176.     Paragraph 176 contains legal conclusions which are denied. It is denied that OOH took on the responsibility of services to be rendered by the Project billing services provider under the Project agreement. It is further denied that BBB was ever a biller for the Project.

177.     Paragraph 177 is denied. It is denied that OOH ever breached the first Project agreement or that they were obligated to provide the services that were supposed to be rendered by the billing provider under the first Project agreement. The legal conclusions contained in Paragraph 177 are also denied.

178.     Paragraph 178 contains a legal conclusion which is denied. It is further denied that OOH breached the revenue share and clearinghouse provision of the first Project agreement or that they had any obligation to fulfill the duties under that provision.

179.     Paragraph 179 contains legal conclusions which are denied. It is denied that OOH had any obligation to perform clearinghouse functions under the first agreement. It is further denied that BBB was ever a biller for the Project.

180.     Paragraph 180 is denied. It is denied that OOH had any duties or responsibilities related to Project billing under the First Project agreement.

181.     Paragraph 181 contains legal conclusions which are denied. It is specifically denied that OOH material breached an obligation to work with other parties under the first Project agreement. It further denied that had any obligation to do so as the first Project agreement was not a complete and final contract.

182.     Paragraph 182 is denied in part and admitted in part. It is admitted that VDC did not have any obligations under the first Project agreement as this was not a final or valid contract. However, if this contract is determined to be a valid and final contract, it is specifically denied that VDC complied with its obligations and duties under the first Project agreement.

183.    Paragraph 183 is admitted in part and denied part. It admitted that VDC did not have any conditions precedent under the first Project agreement as this was never a valid and final agreement. However, should it be determined that the first Project agreement was a valid and final agreement, it is denied that VDC completed all conditions precedent, or that their performance under contract was satisfied, waved, or excused.

184.    Paragraph 184 contains legal conclusions which are denied. It is specifically denied that OOH breached the first Project agreement or that the first Project agreement was a valid and enforceable contract. It is further denied that OOH had any of the obligations of the billing company under the first Project agreement.  It is further denied that VDC has incurred the damages as detailed Paragraph 184.

**WHEREFORE**,   Defendant, Primus Healthcare d/b/a Only One Hub requests that this Honorable Court:

A.  Dismiss Plaintiff's claims of Breach of Contract and Fraud in the Inducement with prejudice;

B.  Award compensatory damages to Only One Hub for the financial losses and reputational damage incurred as a result of Plaintiff's fraudulent inducement and breach of contract;

C.  Grant any further relief that this Court deems just and equitable;

D.  Award OOH its costs and attorneys' fees associated with defending against Plaintiff's baseless allegations.

## COUNT III

185.    No response is required to Paragraphs 185 through 190 as Count III was dismissed from Plaintiff's Complaint. To the extent that any response is deemed required, Paragraphs 185 through 190 are denied.

## COUNT IV

191.    Paragraph 191 is an incorporation Paragraph to which no response is required.

192.    Paragraph 192 contains legal conclusions which are denied. It is specifically denied that or Hersperger missed represented any facts related to the Project.

193.    Paragraph 193 is denied.

194.    Paragraph 194 is denied.

195.    Paragraph 195 is admitted in part and denied part. It is admitted that payment for the tests performed was a critical condition for all of the parties' participation in the Project. Any implication that OOH or Hersperger are responsible for payment not being received is denied.

196.    Paragraph 196 contains legal conclusions which are denied. It is denied that it was OOH or Hersperger's obligation to manage the billing company, that they failed to create a functional HIPPA compliant database, that they did not use proper billing codes, that they were not transparent relating to claims submission, that Project funds were not properly handled, or that they were not willing to collaborate with other parties.

197.    OOH is without sufficient information to know why or why not VDC would have agreed to participate in the Project. Any implication that or Hersperger failed to satisfy any conditions related to the Project is denied.

198.    Paragraph 198 is denied. It is denied that OOH or Hersperger made any misrepresentations to induce VDC to participate in the Project.

199.    Paragraph 100 is denied.  It is denied that OOH or Hersperger made any representations to VDC or any other parties to the agreement. It is further denied that OOH or Hersperger made misrepresentations to deceive VDC in any way.

200.    OOH cannot possibly know what information VDC relied upon or used to make any decisions. Accordingly, Paragraph 200 is denied. It is specifically denied that OOH or

Hersperger made any misrepresentations to VDC related to the Project or that OOH or Hersperger engaged in any deficient performance or unlawful conduct

201.    Paragraph 201 contains a legal conclusion which is denied. It is denied that OOH or Hersperger engage in any violations against VDC in anyway. It is further denied that VDC has suffered in excess of $50,000 based on OOH or Hersperger's alleged conduct.

202.    Paragraph 202 contains a legal conclusion which is denied. It is denied that Hersperger made any misrepresentations to VDC relating to the Project.

203.    Paragraph 203 contains legal conclusions which are denied. It is denied that agents and representatives of OOH engaged in any wrongful conduct or made any false statements.


**COUNT V**

204.    Paragraph 204 is an incorporation Paragraph to which no response is required.

205.    Paragraph 205 is denied. It is specifically denied that OOH or Hersperger made any misrepresentations relating to the Project.

206.    Paragraph 206 is denied. It is specifically denied that OOH or Hersperger made any material misrepresentations or contradictory representations regarding the Project.

207.    Paragraph 207 contains legal conclusions which are denied. It is specifically denied that OOH or Hersperger made any material misrepresentations to VDC or that they made any statements that they should have known were false.

208.    Paragraph 208 is admitted in part and denied part. It is admitted that payment was critical to the participation of all parties to the agreement. It is denied that the lack of payment received by any fault or Hersperger.

209.    Paragraph 209 contains legal conclusions which are denied. It is specifically denied that OOH or Hersperger failed to adequately perform any of the functions described in Paragraph 209 or that they were obligated to perform those functions at all times during the agreement.

210.    Paragraph 210 is denied. OOH cannot know why VDC would have agreed to participate in the Project. It is denied that or Hersperger failed to satisfy any conditions required of them under the agreement.

211.    Paragraph 211 is denied. This specifically denied that OOH or Hersperger made any false statements with the intent to mislead VDC.

212.    Paragraph 212 is denied. It is specifically denied that OOH or Hersperger made any misrepresentations to VDC or that any representations made were to induce VDC into the agreement.

213.    Paragraph 213 is denied. It is specifically denied that OOH or Hersperger made any misrepresentations in order to deceive or mislead VDC in any way.

214.    Paragraph 214 contains legal conclusions which are denied. It is specifically denied that OOH or Hersperger made any misrepresentations to VDC relating to the Project or that OOH and/or Hersperger's conduct relating to the Project was deficient in any way.

215.    Paragraph 215 contains legal conclusions which are denied. It is specifically denied that OOH or Hersperger violated the agreement or made any false statements. It is specifically denied that VDC has been injured in excess of $50,000 by OOH or Hersperger.

216.    Paragraph 216 contains legal conclusions which are denied. It is specifically denied that Hersperger made any misrepresentations relating to the Project.

217.    Paragraph 217 is denied. It is denied that agents or representatives of OOH or Hersperger engaged in wrongful conduct or made false statements relating to the Project. Any legal conclusions contained in Paragraph 217 are denied.

## COUNT VI

218.    Paragraph 218 is an incorporation Paragraph to which no response is required.

219.    Paragraph 219 rule refers to a Pennsylvania rule of civil procedure, which speaks for itself.

220.    Paragraph 220 contains a legal conclusion to which no responses required to the extent that responses required Paragraph 220 is denied.

221.    Paragraph 221 contains legal conclusions which are denied. It is denied that OOH prevented the performance of any third-party biller or that OOH became became obligated to perform the clearinghouse functions set forth in the Project agreement at any time.

222.    Paragraph 222 is denied in part and admitted in part. It is admitted that the Project agreement imposes certain obligations on the Project biller.  It is denied however, that any of those obligations were imposed on OOH.

223.    Paragraph 223 contains a legal conclusion to which no responses required. It is denied that had the obligation to perform the duties described in Paragraph 222 or that they reached the Project agreement.

224.    Paragraph 224 is admitted in part and denied in part. It is admitted that since around January 2023, OOH has been the sole biller for the Project and that they are responsible for claim submission, payment and distribution. Any implication that this obligates OOH to the duties as described to the billing services provider under the agreement is denied.

225.    Paragraph 225 contains legal conclusions which are denied. It is denied that OOH is required to perform the clearinghouse function set for in the Project agreement. Implication that OOH has not appropriately served as the billing provider is denied.

226.    Paragraph 226 contains legal conclusions which are denied. It is denied that relationship created by Project agreements, impose, legal duty or obligation on OOH to take responsibility of the billing provider under the agreement. It is admitted, however, that has provided VDC with information related to the submission of claims billed, and payments made related to the Project.

227.    Paragraph 227 is admitted in part and denied part. He admitted that VDC has requested information from OOH. It is denied that only one to provide this information or has refused Relating to why complete payment has not yet been made.

228.    Paragraph 228 is denied. It is denied that OOH has refused to provide this information to VDC.

229.    Paragraph 229 contains legal conclusion which is denied. It is denied that has breached its duty to VDC in anyway or that OOH has failed to provide an accounting to VDC.

## COUNT VII

230.    Paragraph 230 is an incorporation Paragraph to which no response is required.

231.    Paragraph 231 is admitted in part and denied in part. It is admitted that. 2020 3OOH assumed responsibility for billing Project claims. It is denied that had an obligation to hold those claims in escrow for VDC.

232.    Paragraph 232 contains legal conclusion to which no responses required. The extent that a response is required Paragraph 232 is denied.

233.    Paragraph 233 is denied. It is specifically denied that OOH or Hersperger having engaged in fraudulent conduct or material statements to VDC related to the Project.

234.    Paragraph 234 is denied. It is specifically denied that OOH and Hershberger have engaged in any fraud or made any misrepresentations relating to the Project or that OOH or Hersperger wrongfully possesses property belonging to VDC in the form of Project revenues.

235.    Paragraph 235 is admitted in part and denied in part. It is admitted that the Project billings and accounts are complicated. It is denied that OOH and Hersperger have refused to provide VDC with necessary information to understand which claims have been processed and submitted what payments have been made and how payments have been distributed.

236.    Paragraph 236 is denied. It is specifically denied that LH and Hersperger have engaged in any unlawful conduct or that VDC has been harmed by any of their contact.

237.    Paragraph 237 is denied. It is denied. The VDC does not possess an adequate remedy at law as their remedy is to pursue a legal action against plaintiff as they are doing this lawsuit.

## **COUNT VIII**

238.    Paragraph 238 is an incorporation Paragraph to which no response is required.

239.    Paragraph 239 refers to a Pennsylvania rule of civil procedure, which speaks for itself.

240.    Paragraph 240 cites Pennsylvania law which speaks for itself.

241.    Paragraph 241 contains a legal conclusion to which no response is required to the extent to the response is required. Paragraph 241 is denied.

242.    Paragraph 242 is denied. It is denied that OOH has not adequately or timely submitted. Processed payments or distributor revenues from Project claims or that has not provided adequate information and reporting to VDC.

243.    Paragraph 243 is denied. It is specifically denied that OOH is performance of the Project has been defective or an adequate or that they have engaged in unlawful conduct.

244.    Paragraph 244 denied. It is specifically denied that OOH has had any defective performance or instances of unlawful conduct. It is also denied that any risk that Project claims will not be paid lies with OOH or that any Project that come in will not be properly distributed.

245.    Paragraph 245 is admitted in part and denied part. It is admitted that all parties to the Project have suffered harm due to third-party payers rejection of Project claims. It is denied that any rejection of the claim is due to any action by OOH. This further denied that has improperly handled or distributed Project proceeds.

246.    Paragraph 246 contains a legal conclusion to which no response is required. To the extent that a response is deemed required. Paragraph 246 is denied.

247.    Paragraph 247 is denied. VDC does have an adequate remedy at law as demonstrated in fire counts of this Complaint. It is denied that OOH or Hersperger having engaged in any unlawful conduct towards VDC.

248.    Paragraph 248 contains legal conclusions which are denied. Is denied that VDC be unable to obtain recovery or that they have suffered from any conduct of. It is also denied that OOH will not be harmed by the appointment of a limited receiver. By way of further response, the limited receiver that was appointed this case has already build OOH $25,000 for work, allegedly performed in their duty as a limited receiver.

249.    Paragraph 249 is denied. The appointment of a limited receiver has been more harmful than helpful to OOH as it has diverted resources that could've been used to attempt to obtain payment from the healthcare companies.

250.    Paragraph 250 contains illegal conclusion which is denied. It is denied that the appointment of the receiver is reasonably suited to a wrong, or that is narrowly tailored in anyway. Further response, the appointment of a limited receiver has only served to harm OOH and VDC

by diverting resources that could've been used to obtain payment from, payers for the testing claims.

251.    Paragraph 251 contains a legal conclusion to which no response is required.

252.    Paragraph 252 contains legal conclusions to which no responses required. To the extended response team required Paragraph 252 is denied. It is further denied that engaged in any unlawful conduct.

253.    Paragraph 253 contains a prayer for relief to which no response is required to the extent that a response to team required Paragraph 253 is denied.


## NEW MATTER

Defendant Only One Hub d/b/a Primus Healthcare, for its New Matter to Plaintiff's Complaint, states as follows:

254.    OOH incorporates by reference the foregoing Paragraphs as though fully set forth at length herein.

255.    On or about March 2020, executives of OOH, including Hersperger, approached VDC executives, including Drew and J. Mark Bovier, about the possibility of collaborating on a project for Covid-19 with Only One Hub and Genotox Laboratories.

256.    The parties were in discussions for several months as to how the project would work.

257.    The project agreement initially laid out certain responsibilities for each party involved in the project.

258.    The parties determined that billing should be out-sourced to a professional billing company that had experience in Covid-19 billing. OOH was initially tasked to select the outside billing company.

259.    The parties initially consulted with Triple-B-Billing to serve as the billing company for the project, but Triple-B-Billing ultimately decided that they did not want to be involved with the project because it would be too time consuming and Covid-19 reimbursements may be difficult.

260.    The parties circulated a draft project agreement in or about May of 2020, however, this draft of the project agreement was never signed by the parties.

261.    VDC required several revisions to the agreement over the course of the negotiations and its executives were very particular as to the duties that would be handled by each party.

262.    In June 2020, the parties began offering Covid-19 testing at approximately six pharmacies.

263.    The parties had weekly meetings from the start to discuss the progress of the Project and work on issues that arose along the way.

264.    VDC also insisted on weighing in on every aspect of the Project.

265.    Executives from both OOH and VDC visited these initial pharmacies to train the pharmacists and their staff on the correct procedures for the project.

266.    Walter McCullough, a VDC executive, took on a principal role in training the pharmacies and he initially joined OOH executives in the field to train the pharmacies.

267.    OOH executives trained VDC executives in proper procedures for conducting the Covid-19 testing, patient assessment, sample collection, and obtaining demographic and insurance information from the customers. On several occasions, VDC executives provided incorrect information to the pharmacies, which ultimately resulted in delays in testing results, customers being turned away for testing, and incomplete or incorrect demographic and insurance information gathered from the patients.

268.    As the CDC guidance changed, OOH relayed these changes to the pharmacies and staff.

269.    Multiple strains of Covid-19 emerged and created spikes of the virus in different demographic areas which OOH constantly monitored. These spikes created operational challenges for laboratories throughout the country, Genotox Laboratories included.

270.    OOH had weekly operational calls with Genotox Laboratories and discussed the latest Covid-19 trends and any operational issues related to this program. OOH kept VDC informed of any delays Genotox Laboratories incurred due to high volume.

271.    On multiple occasions, the pharmacies forgot to send completed test specimens to Genotox Laboratories, which caused an extensive amount of confusion for the staff of OOH and Genotox Laboratories who were desperately trying to locate specific samples for patients, some of whom were urgently awaiting their results.

272.    Additional pharmacies were added to the program in August 2020 and later.

273.    Eventually, OOH became exclusively responsible for training the pharmacies as VDC executives no longer wanted to be involved once the pharmacy locations fell outside of the immediate geographic area of VDC's headquarters. OOH left binders with step-by-step instructions and cell phone numbers of essential OOH staff at each location after all training sessions.

274.    The patient portal and Project website also contained extensive information and instructions. The cost of development was solely borne by OOH. VDC executives constantly requested changes that were very time-consuming and costly, these changes were made as quickly as possible, most of which were completed the same day.

275.    VDC questioned the HIPAA compliance of OOH's software, as a result, Hersperger had a phone call with a VDC employee in the IT department related to the software, and the IT expert confirmed that OOH's software was HIPAA compliant and he did not have any further suggestions to improve the software.

276.    At some point, VDC requested that OOH provide a training video which OOH executives agreed to provide, however, VDC wanted the video completed immediately and were unwilling to wait more than one week for turnaround on the video. OOH laid out all content for the video including step-by-step instructions, artwork, and b-roll.

277.    VDC decided to make their own purported training video, which was unusable, as the VDC video was primitive and contained incorrect instructions for the pharmacies.

278.    When setting up a new pharmacy to become part of the Project, OOH provided the pharmacy with marketing materials – including Covid-19 flags, yard signs, and brochures. OOH provided iPads to the pharmacies upon request. All promotional items were at the expense of OOH.

279.    OOH developed and designed all commercial production, web development, artwork development, brochures and signage design.

280.    At some point during the Project, the decision was made that the pharmacies would no longer be provided iPads. This was after a discussion between OOH and VDC as the pharmacies were not utilizing the iPads as part of the project, and there were multiple occasions where the iPad provided was stolen from the pharmacy.

281.    Throughout the Project, VDC was incredibly difficult to work with – they limited OOH's access to the pharmacy principles, prohibited OOH from contacting the pharmacies when issues arose relating to information not being gathered correctly by the pharmacies.

282.    VDC insisted on stockpiling an unreasonable amount of Covid-19 testing kits in their warehouse.  This over-estimation was extremely costly to Genotox Laboratories, a cost which was eventually passed to OOH. When OOH pushed back on the stockpiling of kits,  Drew became incredibly hostile to Hersperger. At one point, Drew threatened physical violence with Hersperger.

283.    On numerous occasions, Drew blamed third-party failures, many of which were a routine part of business transactions, on Hersperger. This included blaming Hersperger when

FedEx accidentally delivered incorrect packages to VDC or the pharmacies. Delivery mistakes were not in OOH's control, all packages were shipped by Genotox Laboratories through FedEx in most cases.

284.    Genotox Laboratories staff was unable to handle the extensive volume of customer calls that occurred when the Project began. The pharmacies were not properly using the system created to handle specimen intake and tracking. The pharmacy staff was overwhelmed and routinely gave out the client service number, manned by OOH staff, instead of addressing patient intake. OOH provided staff to contact pharmacies and their staff directly to educate them and provide customer service to patients.  Most of these issues were caused by pharmacies and their staff members incorrectly inputting information such as demographics and specimen sample kit numbers which are used to track individual specimens. Due to the overwhelming issues caused by the pharmacy staff, OOH was forced to take over all customer service calls as Genotox Laboratories could not accommodate service requests. OOH serviced a minimum of 17,000 client service calls and created a log of each one. There were thousands of calls documenting the deficiencies of pharmacy staff.

285.    Hersperger created the Project software which included a section to scan and upload an image of the insurance card and patient identification. This section was in the patient's medical assessment which the pharmacist or staff had to review to verify demographics and determine if medical necessity was met for the test.  The insurance card and patient identification were uploaded less than 6% of the time, which caused claims to be delayed or remain completely unbilled if information was entered incorrectly.

286.    It soon became evident that for unknown reasons, the pharmacies were not collecting images of patient insurance cards; and in addition, the pharmacies routinely failed to even verify the patient insurance information when the patient was standing in front of them.

287.    Without confirming patient insurance information, it was nearly impossible to bill for those claims.

288.    The pharmacies also routinely failed to input or verify patient demographic information, causing those claims to be unbillable without the correct information.

289.    When OOH requested to communicate extensively with pharmacies to provide critical reminders, such as obtaining and verifying patient insurance information, VDC demanded OOH temper communications to certain pharmacies, as they were afraid of losing the pharmacy business. This exacerbated the problem.

290.     OOH set parameters in the software to verify insurance cards and identification were scanned and uploaded. This was intended to prevent the pharmacies from finalizing the test entry without this information attached.

291.    Less than 24 hours after that change was added to the software, VDC contacted OOH and demanded that the insurance card and identification image requirements be removed because it was too difficult for the pharmacies.

292.    OOH Executives and Genotox Laboratories utilized third-party services for post claims discovery purposes when the pharmacies failed to capture the correct information. This incurred significant costs to both parties. The staff of OOH called patients directly to attempt to recover insurance information directly.  This was a very costly and arduous task.

293.    The parties continued to search for a billing company partner throughout the summer of 2020.

294.    Hersperger suggested that OOH perform billing services in-house so the parties could submit insurance claims for testing, however, VDC was against this idea.

295.    In Fall 2020, the parties met with Bruce Bartlett, the owner of Medical Service Associates (hereinafter "MSA"), who held himself out to be an experienced and knowledgeable

medical claims biller who could competently handle the Covid-19 claims, as he had done for thousands of Covid-19 claims for his current clients.

296.    VDC had ample opportunity to evaluate the choice of the billing company and object if they had reservations about MSA.

297.    Drew insisted on having full engagement with Bruce Bartlett from MSA, and upon the information and belief of OOH, the two had frequent telephone conversations and electronic mail communications regarding billing for the project.

298.    Once MSA was selected as the biller for the project, the draft project agreement was revised to reflect the selection and all parties executed the same.  A true and correct copy of the agreement of the PCR Covid-19 Testing Project, dated October 28, 2021, is attached to this Answer, New Matter, and Counterclaims as **Exhibit A**.

299.    MSA and Bruce Bartlett indicated he could have all billing up to date within a 2-week period from the date he started. He would bill daily or weekly depending on volume. He stated that he had systems and personnel currently in place to perform claims discovery, which was necessary when the pharmacies failed to enter the correct insurance information.

300.    Bruce Bartlett from MSA, who purported to be an experienced claims biller, stated the claims must be submitted under Dr. Richard Kastelic's – the Project's Medical Director for Pennsylvania – NPI number to expedite claims payment as his credentialing was already in place.

301.    Bartlett discussed the option of creating an NPI for OOH and billing with OOH listed as the service provider. Bartlett represented that it would take an additional 4 to 6 weeks to establish credentialing to submit claims through OOH. Bruce Bartlett stated he could code the claims to ensure the information would be adjudicated in his billing system. Claims reporting was to be electronically accessible to all project partners in real time.

302.    Bartlett also represented that the claims should be billed for two different services on two separate days and that claims should be coded as if each encounter were a new patient office visit.

303.    OOH and VDC relied on the expertise of MSA and Bartlett who indicated these codes were successful for other clients.  He also stated that according to AMA guidance, this was the proper way to bill Covid-19 claims for testing services.

304.    Hersperger worked diligently with Bartlett to ensure that he had access to all claims data in real time. He also fulfilled any requests from Bartlett to provide information necessary to complete uploads of the claims information to his billing software.

305.    On multiple occasions at the request of Bartlett, Hersperger adjusted how the data was exported from OOH's software to facilitate the expedient exchange of claims information.

306.    After weeks of the onset of MSA's contract beginning, Bruce Bartlett stated that neither he nor his staff had the technical ability to upload the claims data from OOH's software into his billing system. He had to hire a third-party technician to create an interface to upload the claims into his system.  This was done only after extreme pressure from OOH.  The technician failed to build the interface due to lack of knowledge and cooperation from the MSA staff. Genotox Laboratories was also tasked with building an interface from the OOH software to their software, and this was completed with one day. As MSA failed to get an interface, which they clearly stated they had the ability to do, their staff was forced to key claims information into their system manually, which took weeks to complete.

307.    Despite the project agreement being executed in October, MSA was not able to get the first set of claims billed until late November or early December 2021.

308.    Before October 2021, there were fewer than 1000 claims for Covid-19 testing as part of the project.

309.     The number of Covid-19 tests being done as part of the project exploded in November, December, and January 2022.

310.     The test volume became a problem for MSA making it difficult for them to get the claims submitted in a timely manner due to their lack of performance.

311.     As soon as payments began to come in for the claims submitted by MSA, it became clear that Bartlett had made coding errors, which caused claim payments, explanations of benefit, and denial information to flood Dr. Kastelic's office and mix with payments and information for his routine office patients. This was due to the MSA's requirement that Dr. Kastelic's information be used to submit claims.

312.     After numerous issues, Hersperger expressed his concerns with Bartlett and MSA's performance to VDC at their weekly meetings.

313.     Hersperger preferred to locate a new billing company that could better handle the volume and complexity of the claims; however, Grew Drew was resistant to change as Bartlett, in conversations with Drew, falsely blamed OOH and Hersperger for any issues or failures with the claims billing. For example, the inability of MSA to develop an interface between OOH and MSA's billing system. This was the same interface that Genotox Laboratories was required to build to bill claims, and theirs was completed within one day and they were successfully able to begin billing claims.

314.     MSA and Bartlett consistently lied to Drew to cover up their inefficiencies and blamed OOH and Hersperger. All parties detrimentally relied upon the expertise of MSA and Bruce Bartlett. Bartlett falsely conveyed information to all parties that he had the ability and staff to bill claims in a timely and efficient manner.

315.     OOH was aware of all issues with MSA and Bartlett and tried repeatedly to convince Drew that the project billing company needed to be changed. The discussions became

extremely contentious on the part of Drew, who threatened physical violence toward Hersperger. OOH was pushing to retain a new billing company to help mitigate the damages. Drew and VDC ultimately agreed that the parties should find a new project biller.

316.    Hersperger notified Bruce Bartlett at MSA in January 2022 that MSA was being terminated as the Project biller and demanded that MSA immediately pause the submission of additional claims on behalf of the Project participants.

317.    Despite the instruction to pause claim submission, MSA submitted thousands of additional claims with incorrect coding information, resulting in additional claim payments and statements being sent to Dr. Kastelic's office. This caused additional delays due to claim corrections being required.

318.    OOH and Hersperger again recommended they bill the claims themselves by purchasing third-party software and hiring billing staff. This was rejected by VDC.

319.    Although some payments were made on the claims billed by MSA through Dr. Kastelic's office, most of the claims were denied, underpaid, or later "taken back" by the health insurance companies due to the incorrect coding that had been done by MSA.

320.    OOH executives, including Hersperger, met with Alex and Lauren Lau, the owners of MedWave billing, to discuss the Project and the possibility of them working with the parties as the project builder.

321.    MedWave held itself out to be an experienced billing company that could handle large volumes of claims, could advise the parties as to the appropriate coding for Covid-19 claims and who could work with the parties to make sure that the backlog of outstanding claims was properly submitted or resubmitted to the insurance companies for payment.

322.    Based upon the representations made by MedWave and OOH's due diligence in vetting the billing company, OOH believed that MedWave would be able to competently serve as the project biller.

323.    Drew of VDC separately met with Alex and Lauren Lau and similarly believed that MedWave had the appropriate experience and expertise to serve as project biller.

324.    The parties eventually chose to employ MedWave as the new project biller, which became effective on March 1, 2022 by agreement between OOH and MedWave.

325.    MedWave did not sign a copy of the Project Agreement as there had been numerous changes to the project and various roles and responsibilities of the parties as the project went on.

326.    MSA refused to provide MedWave or OOH with the information regarding previously submitted claims had been paid, denied, or otherwise processed.

327.    Without the reports indicating the status of the claims that had been submitted by MSA, reconciling and rebilling and/or appealing these claims became incredibly difficult.

328.    It was also difficult to determine what payment was made, if any, of the claims and in turn, which pharmacies should be paid for those claims.

329.    MedWave advised the parties as to what it believed to be appropriate billing codes for the Covid-19 testing services.  They claimed they were utilizing these codes with numerous clients successfully. They stated that in the previous month they had successfully billed over 100,000 Covid-19 claims.

330.    The parties exchanged email correspondence regarding the American Medical Association's guidance on billing for Covid-19 testing and all parties ultimately agreed that the procedural code used should be 99213, which was for a 20-minute established patient office visit.

331.    Lauren Lau, a co-owner of MedWave, instructed the parties that an established patient office visit code should be used rather than a new patient office visit code, because a new

patient code would require supporting documentation, indicating that a full medical history had been taken by the physician to support the claim.

332.    On June 29, 2022, MedWave provided an electronic mail update to the parties, representing the following:

a.  **Regarding the Claims from before 3/1/2022**

  i.  MedWave was unable to resubmit these claims electronically as they believed they would have been denied as duplicate claims, paid twice, or otherwise flagged. MedWave represented this decision was made after consultation with her "special contacts" at the insurance companies.

  ii.  MedWave identified all the insurance companies on the master Primus [OOH] CSV file, separated the claims out by insurance company, and submitted them to a billing department representative at each insurance company as "special claims projects ".

  iii.  That the special claims projects were submitted to each pair of the week of the 13th to 20th of June 2022.

  iv.  That the payers would have 30 days to review the claims and another 30 days to pay the claims if it was previously unpaid.

  v.  That all HRSA claims were submitted through the HRSA portal by the previous billing company (MSA) in February of 2022.

  vi.  That MedWave resubmitted the HRSA claims in March 2022 in case some were not paid.

  vii.  That all claims associated with the special claims project would be uploaded to the Advanced MD portal in the upcoming weeks.

b.  **Claims from 03/01/2022 forward**

    i.   That they had set OOH up with the billing platform and attached a licensed doctor from each operating state to the entity.

    ii.   That they had begun EFT set up from Medicare to be able to submit claims.

    iii.   That they had submitted the appropriate documentation to the commercial payers to be able to submit electronic claims.

    iv.   That they would submit all unbuild claims as soon as they finalized the set up for electronic claim submission.

    v.   That they were making weekly phone calls to the commercial payers and Medicare to check on the status of approval for electronics claim submission.

333.    Based on the update from MedWave, the parties believed that all HRSA claims had been submitted for payment at least once. This was determined to be a lie after OOH investigated the HRSA portal and saw that the claims had not been submitted by MSA and Bartlett or MedWave and Lauren Lau.

334.    OOH never received a payment for any of the HRSA claims. The federal funding for HRSA claims was exhausted and has not been re-established to date, resulting in a loss of payment for approximately 7500 claims.

335.    The parties also believed based on the statements from MedWave that all of the claims with dates of service prior to March 1, 2022 had been submitted to each of the healthcare payers by way of a file in the form of a claims project.

336.    The parties had no reason to believe that the statements made by MedWave were false.

337.    Despite these representations from MedWave, the billing issues continued. OOH and VDC repeatedly requested that MedWave provide updates on the claims projects and the processing of new claims; however, it soon became evident that no progress was being made.

338.    Both Hersperger and Drew had multiple telephone calls with MedWave, who assured the parties that they were working on getting everything set up and that they were waiting to hear back from the insurance companies regarding the claims projects.

339.    OOH repeatedly requested that MedWave provide copies of the claims projects that had been submitted to various payers so that OOH staff could review and follow up. The information was never sent to either VDC or OOH.

340.    Rather than providing the requested information, MedWave sent a notification to OOH severing their partnership for the Project. This cancellation occurred to cover up their fraudulent behavior after OOH and VDC requested proof of the same.

341.    As part of the separation as the billing provider, OOH, again, requested the claims project spreadsheets that MedWave had allegedly submitted to the health insurance payers, as well as contact information for person in each claims department that MedWave had been dealing with relating to the claims projects.

342.    MedWave refused to provide contact information for anyone at any of the health insurance payers so that OOH could continue to work on the alleged claims projects, stating that these were private contacts that MedWave had gathered over time and could not share them with OOH.

343.    MedWave also uploaded five purported claims project spreadsheets, but the spreadsheets were merely a download of the claims data directly from OOH's software, not any work product or special format put together by MedWave.

344.    OOH representatives attempted to contact both the legal and claims departments of several of the major healthcare payers to verify that claims projects had been submitted, or, if they had not been submitted to begin this process.

345.    The response from all of the payers was that there was no record of any claims projects, and that this was not the appropriate method to attempt to get payment for these claims.

346.    A representative in UPMC Health Plan's legal department specifically informed OOH that it was impossible for them to look up such information and that the only way to handle the outstanding claims was to resubmit them for payment to UPMC's claims department.

347.    Based upon the limited documentation that MedWave provided, their refusal to share the contact information, and the response from the health care payers, the only logical conclusion is that MedWave did not contact the payers and begin the claims project process that they alleged to have started in their June 29, 2022 email.

348.    Drew and VDC executives were well aware of the misrepresentations made by MedWave and that the reason they had terminated the agreement to be the billing provider for the Project was to cover up their fraudulent behavior.

349.    After several of VDC's member pharmacies expressed frustration with the lack of claims payments, OOH capitalized advanced commissions to the pharmacies in the amount of $20 per test that had been collected at the pharmacy.

350.    OOH paid out $400,000 to VDC pharmacies in advanced claims payments to mitigate loss of pharmacies in the program and to retain the current pharmacies in the program. VDC made no effort to assist OOH in making said advanced payments.

351.    OOH was forced to stop making the advanced claim payments when it became clear that obtaining reimbursement from health insurance companies was more difficult than the parties had initially anticipated due to the false representations of the billing companies.

352.    Aside from the issues with MSA and MedWave, the Explanation of Benefits documents received from the healthcare payers overwhelmingly indicated that the health insurance payers were not appropriately following the guidelines set forth in the Cares Act and the FFCRA related to payment for Covid-19 testing claims.

353.    Upon a review of the documentation received by health insurance companies, there were numerous instances where the insurance company inappropriately subtracted a deductible or a copayment amount from the amount of payment received as part of the Project, despite the clear guidelines in the federal legislation prohibiting the insurance companies from making its members pay a co-pay or towards their deductible for medically necessary Covid-19 testing.

354.    There were other instances where claims were denied as being out-of-network, which was not applicable as part of federal legislation relating to the payment of Covid-19 testing claims addressed.

355.    There were also claims denied for a variety of other illegitimate reasons by the health insurance companies.

356.    OOH became aware of a pattern by Highmark, Blue Cross Blue Shield, Anthem, and other Blue Shield entities of paying the patients directly for the services that have been provided rather than paying the provider.

357.    There are numerous instances of recent litigation against Blue Cross Blue Shield entities regarding this practice across the Country.

358.    This remains an ongoing issue with the outstanding claims, and the health insurance payers are being extremely difficult when it comes to payment based upon the FFCRA and the Cares Act because current federal case law relating to these acts indicates that the provider should not have to pursue payment from the health insurance companies, as they should have been paid under the law.

359.    Instead of working collaboratively with OOH to obtain payment from the insurance companies, as required by the project agreement, VDC has instead continued to place all blame on OOH and has chosen to pursue legal action in the form of this litigation, further diverting resources from OOH that may otherwise be used to make good faith payments on the testing claims.

360.    Prior to MedWave's termination as the project biller, VDC had already indicated to OOH their intention to discontinue their participation in the Project.

361.    A number of VDC pharmacies that had been participating in the project switched to a new testing program under the direction of VDC or stopped testing altogether, and VDC forced OOH to immediately remove all testing kits from its warehouse, where tests had previously been stored for distribution to the pharmacies.

362.    Due to the overabundance of test kits ordered by VDC from Genotox Laboratories, OOH is currently paying for storage each month for approximately 70,000 test kits. OOH has also incurred the cost of the test kit overstock; the approximate value being estimated in excess of $700,000.00.

363.    OOH attempted to locate a new billing provider for the project, and spoke to several potential billing partners, however, they were ultimately unable to locate a partner they were confident with.

364.    OOH notified VDC of their difficulties finding a new billing company.

365.    In an effort to mitigate damages and recoup reimbursements from insurance companies, OOH purchased a billing software subscription and hired several employees to bill all outstanding claims and resubmit those claims previously been denied.

366.    Initially, OOH was remotely successful in obtaining payment on some of the outstanding claims.

367. However, it continued to be incredibly difficult to get the health insurance payers to review and pay the claims in good faith, based upon the age of the claims.

368. On numerous occasions, claims were denied multiple times for various reasons each time.

369. Claims were also denied inconsistently. One claim would be paid with the same information and a person with the same insurance plan would be denied for that claim.

370. When payments on the claims were made, the health insurance companies routinely underpaid the claims for significantly less than the billed amount of $150 per claim.

371. Shortly after OOH began billing the Project claims, both Dr. Kastelic's office and OOH began to receive letters indicating that the health insurance companies were taking back the funds that had previously been paid for the Covid-19 testing claims.

372. A large portion of the takebacks were offset against any future payments owed to either entity by the health insurance payers.

373. OOH's staff billed or rebilled every claim for which there was complete and accurate insurance and demographic information.

374. OOH's staff also used the health insurance company portals that they had access to search for accurate patient insurance information, and while there was limited success, this was an extremely time-consuming effort that did not ultimately yield great results.

375. OOH developed software for the Project, routinely updated the software, and worked with other project partners to improve the software when necessary.

376. OOH fronted the costs for all marketing materials, set up a customer service line for the Project, created and paid for the software used for the project, paid for FedEx shipping for all marketing material and test kits, paid numerous employees who worked exclusively on the project, fronted the costs for all software and servers to operate the project, has paid to store the

test kits that were removed from VDC's warehouse for the past year, made upfront payments of $400,000 to VDC's pharmacies, paid the medical directors and the billing companies for their participation in the Project, and has incurred the cost of the overstock of 70,000 testing kits.

377.    Between the insurance denials and the takeback on claims that were paid, the amount that OOH has paid out to the pharmacies in prepayments far outweighs what was able to be recouped from the insurance companies to date.

378.    The Project Agreement was intended to be a collaborative project between all the parties to provide Covid-19 testing when there was a high demand for such testing during the pandemic.

379.    Due to various unforeseen circumstances and bad faith on behalf of the health insurance companies who should have paid these valid claims, the project was overall unsuccessful.

380.    OOH invested most of the funds for the project and was left attempting to scramble to recoup any limited funds possible from the testing claims when all other parties stopped performing under the agreement.

381.    Ultimately, OOH has been forced to scramble to retrieve reimbursement while all of the other project partners bowed out.

382.    VDC's claims are barred, in whole or in part, by VDC's own breach of the contract prior to any alleged breach by OOH.

383.    VDC's claims are barred, in whole or in part, by frustration of purpose, as many unforeseen circumstances prohibited the parties from fulfilling their duties as described in the Project Agreement.

384.    VDC's claims are barred, in whole or in part, by failure of condition precedent, due to the fact that under the terms of the agreement, VDC's pharmacies were required to conduct

patient intake, which included gathering and verifying that they had obtained the correct insurance and demographic information for each patient.

385.    Without the complete and accurate insurance and demographic information, it became impossible for the other parties to fulfill their responsibilities under the agreement and to make a claim for payment for the test.

386.    VDC's claims are barred, in whole or in part, by impossibility of performance, as many unforeseen circumstances prohibited OOH from fulfilling all duties as described in the Project Agreement.

387.    VDC's claims are barred, in whole or in part, by mutual mistake, as the parties mistakenly held an erroneous belief that the health insurance payers would act in good faith when they were presented with claims for Covid-19 testing.

388.    VDC's claims are barred, in whole or in part, by mutual mistake, as the parties mistakenly held the erroneous belief that the claims were submitted by MSA and MedWave, and that the costs would be covered under HRSA, the federal government program that reimbursed claims for uninsured patients. The claims were not submitted by either billing company.

389.    VDC's claims are barred, in whole or in part, by VDC and their member pharmacies' failure to mitigate damages, by ensuring that proper insurance and demographic information was collected from the patients at the time of the testing.

390.    VDC's claims are barred, in whole or in part, by VDC's pattern of preventing OOH from reaching out to certain pharmacies to notify them of the inadequacies in their data collection.

391.    VDC's claims are barred, in whole or in part, as VDC's pharmacies have already received more revenue than was actually collected from the health insurance companies for the claims.

392.    VDC's claims are barred, in whole, or in part, by payment, as OOH has already made payment to VDC's pharmacies in the amount that was more than was recouped from the insurance companies based on the staggering cost of OOH's attempt to recover claim reimbursement.

393.    VDC's claims are barred, in whole, or in part by waiver, as OOH, while in the process of rebilling the testing claims, offered to pay VDC $50,000 once VDC informed OOH that it was no longer participating in the project, and VDC refused this offer.

394.    All conditions precedent to OOH's right to full performance under the Project Agreement have been satisfied, waived, or excused.

**WHEREFORE**, Defendant, Only One Hub d/b/a Primus Healthcare, requests that this Honorable Court:

A.  Dismiss Plaintiff's claims against Defendant Only One Hub;

B.  Award compensatory damages to Only One Hub for the financial losses and reputational damage incurred as a result of Plaintiff's breach of contract, commercial disparagement, interference with business relationships, and misuse of civil proceedings;

C.  Grant any further relief that this Court deems just and equitable;

D.  Award Defendants their costs and attorneys' fees associated with defending against Plaintiff's baseless allegations.

## COUNTERCLAIMS

Defendant, Only One Hub d/b/a Primus Healthcare, hereby counterclaims against Plaintiff, VDC Drug Company and in support thereof, states as follows:

## PARTIES

395.    Plaintiff – counterclaim defendant VDC Drug Company is a Pennsylvania corporation with a principal place of business at 195 Theater Drive, Duncansville, Pennsylvania 16635.

396.    Defendant – counterclaim plaintiff Only One Hub d/b/a Primus Healthcare is a Wyoming corporation registered to do business in Pennsylvania as a foreign corporation.  OOH has an office location at 100 W High Street, Ebensburg, Pennsylvania 15931.

## JURISDICTION AND VENUE

397.    This Court has jurisdiction over these counterclaims pursuant to 23 U.S.C. § 1367(a) because they are so related to the Plaintiff's claims that they form part of the same case or controversy under Article III of the United States Constitution and the forum selection clause of the Project Agreement states that each party consents to the jurisdiction of the United States District Court, Western District of Pennsylvania.

398.    Venue is proper in this district under 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claim occurred in this district and the forum selection clause of the Project Agreement states that each party waives any objection to the laying of venue in the United States District Court, Western District of Pennsylvania.

## FACTS

399.    OOH incorporates the facts set forth in its New Matter above as though fully set forth at length herein.

## <u>COUNT I</u>
## BREACH OF CONTRACT
### *Only One Hub d/b/a Primus Healthcare vs. VDC Drug Company*

400.    OOH incorporates by reference all the foregoing paragraphs as though fully set forth at length herein.

401.    VDC Drug Company materially breached the Project Agreement by failing to perform under the Project Agreement in the following respects:

      a.   VDC blocked and/or interfered with OOH's ability to adequately reinforce proper intake procedures with the pharmacies;

      b.   VDC refused to instruct the pharmacies that they needed to capture an image of patient's insurance card;

      c.   VDC encouraged its pharmacies to stop participating in the Project;

      d.   VDC demanded that all testing kits be removed from its warehouse, forcing OOH to have to pay to store the kits;

      e.   VDC interfered with the relationship between OOH and MSA by disparaging OOH directly to MSA and misrepresenting various aspects of the Project to MSA;

      f.   Value and Drew refused to recognize that the lack of cooperation from the Pharmacy staff, and management's failure to review the patient insurance information directly impacted the reimbursement of claims;

      g.   Value and Drew were concerned that if pressure was applied to the Pharmacies to comply with the protocols set forth in all training documentation may cause business loss for their core business; and

      h.   Value and Drew continued to blame all problems with the project on OOH and Hersperger when they were only one piece of the working project. The Pharmacy, Laboratory, Billing Company, Shipping Companies, Insurance Companies and

Value all had to support the project. If any part failed in the chain, issues would arise and be blamed on OOH.

402.    It is further alleged that VDC breached the Project Agreement by failing to work with OOH and other Project partners in a coordinated fashion for the fulfillment of the Project.

403.    VDC materially breached the Project Agreement by failing to provide, or by providing deficient and inadequate performance, of each of the "Services to be rendered by VDC" under the Project Agreement.

404.    At all times material and relevant hereto, OOH complied with its obligations and duties under the Project Agreement.

405.    All conditions precedent to OOH's right to full performance under the Project Agreement have been satisfied, waived, or excused.

406.    As a direct and proximate result of VDC's material breaches of the Project Agreement, VDC has impaired the ability of the billing entities to obtain reimbursement on the claims for which the pharmacies failed to obtain correct insurance and/or demographic information.

407.    VDC's failure to meet the agreed-upon standards resulted in OOH being forced to expend significant resources to rectify errors with the Project data and to take on work that was not contemplated at the time of the signing of the Project Agreement.

408.    OOH has suffered financial losses due to VDC's failure to uphold the terms of the Project Agreement, resulting in decreased revenue and substantial damages.

409.    OOH seeks compensatory damages in an amount to be determined, but far in excess of $75,000.00.

**WHEREFORE**, Only One Hub d/b/a Primus Healthcare respectfully requests that this Court enter judgment in favor of Defendant and against Plaintiff in an amount, exclusive of interest

and costs, including attorneys' fees, in excess of $75,000.00, and such other and further relief as the court may deem proper.

## COUNT II
**Tortious Interference with Contract**
***Only One Hub d/b/a Primus Healthcare vs. VDC Drug Company***

410.    Defendant incorporates by reference all of the foregoing Paragraphs as though fully set forth at length herein.

411.    At all relevant times, a valid contract existed between OOH and Medical Service Associates (MSA) relating to payment and terms for billing for the Project claims.

412.    VDC acted intentionally to harm OOH by interfering with the contractual relationship between OOH and MSA.

413.    Specifically, VDC made representations to MSA about OOH and its executives, specifically Richard Hersperger, that caused the contractual relationship between the parties to sour and ultimately resulted in OOH being forced to terminate the contract with MSA.

414.    VDC's interference in the contractual relationship between OOH and MSA was improper because VDC's interference did not represent legitimate business competition, and VDC had no legal or contractual right privilege, or justification to interfere.

415.    VDC executives had a motive to interfere with the contract because of their personal feelings towards OOH executives.

416.    Specifically, Greg Drew displayed a clear animosity towards Richard Hersperger from the outset of the Project, which lead to him improperly assign blame to Hersperger over things over which he had no control.

417.    Greg Drew repeatedly made false and defamatory representations about Hersperger to Bruce Bartlett of MSA, including telling Bartlett that Hersperger did not know what he was

doing, that Hersperger was mismanaging the Project, and that Hersperger did not provide the correct software for the Project.

418.    As a direct and proximate result of the statements made by Greg Drew, Bartlett of MSA ceased productive communication with Hersperger and OOH regarding Project claims and coding and billing information.

419.    OOH's inability to maintain productive communication directly with MSA resulted in miscommunications and refusal on the part of MSA to work with OOH and/or Hersperger to ensure that the Project claims were being properly submitted.

420.    It is contrary to the public interest to permit third parties to interfere in the contractual relationships between two entities without a legitimate purpose.

421.    As described more fully in the preceding paragraphs, VDC's false and defamatory statements to MSA about Hersperger and OOH caused OOH to suffer monetary damages, which have accrued and are continuing to accrue, including OOH being forced to seek and pay for a new billing company and OOH being forced to incur the considerable cost of trying to collect on Project claims on its own.

**WHEREFORE**, Only One Hub d/b/a Primus Healthcare respectfully requests that this Court enter judgment in favor of Defendant and against Plaintiff in an amount, exclusive of interest and costs, including attorneys' fees, in excess of $75,000.00, and such other and further relief as the court may deem proper.

### COUNT III
**Commercial Disparagement**
***Only One Hub d/b/a Primus Healthcare vs. VDC Drug Company***

422.    Defendant incorporates by reference all of the preceding Paragraphs as though fully set forth at length herein.

423.    VDC's false statements to MSA and other third parties about OOH and its executives to third parties constitutes commercial disparagement for which OOH has already suffered pecuniary losses and may suffer future pecuniary losses.

424.    Specifically, Greg Drew of VDC repeatedly made false and defamatory representations about Hersperger to Bruce Bartlett of MSA and other third parties, including stating that Hersperger and/or OOH did not know what they were doing, that Hersperger and/or OOH was mismanaging the Project, and that Hersperger and/or OOH did not provide the correct software for the Project.

425.    VDC and/or Drew knew or reasonably should have known that these statements were false  and that they would cause a loss of business relationships to OOH.

426.    As a direct and proximate result of the statements made by Greg Drew, Bartlett of MSA ceased productive communication with Hersperger and OOH regarding Project claims and coding and billing information.

427.    OOH's inability to maintain productive communication directly with MSA resulted in miscommunications and refusal on the part of MSA to work with OOH and/or Hersperger to ensure that the Project claims were being properly submitted.

428.    As described more fully in the preceding paragraphs, VDC's false and defamatory statements to MSA about Hersperger and OOH caused OOH to suffer monetary damages, which have accrued and are continuing to accrue, including OOH being forced to seek and pay for a new billing company and OOH being forced to incur the considerable cost of trying to collect on Project claims on its own.

## COUNT IV
### Abuse of Process
### *Only One Hub d/b/a Primus Healthcare vs. VDC Drug Company*

429.    OOH incorporates all of the preceding Paragraphs as though fully set forth at length herein.

430.    VDC's filing for a limited receiver with the Court when it already held a valid remedy at law in the form of the instant lawsuit, constituted an abuse of process against OOH.

431.    Instead of serving in the capacity of a limited receiver, as directed by this Court's Order of December 11,  2023, VDC has directed the Limited Receiver to perform a full audit of the Project claims and has forced OOH to incur half of the expense of such audit.

432.    If VDC wanted to engage in a complete reconciliation of the Project claims by calling each health insurance payer individually, VDC can do so at its own expense.

433.    As a direct result of VDC's abuse of process, OOH has suffered harm in the form of attorney and receiver fees in a total amount yet to be determined, but in excess of $50,000.

**WHEREFORE**, Only One Hub d/b/a Primus Healthcare respectfully requests that this Court enter judgment in favor of Defendant and against Plaintiff in an amount, exclusive of interest and costs, including attorneys' fees, in excess of $50,000.00, and such other and further relief as the court may deem proper.

## JURY DEMAND

Defendant – counterclaim plaintiff Only One Hub d/b/a Primus Healthcare demands a trial by jury on all issues triable by a jury.

Respectfully submitted,

BY: /s/Amy L. Thomas_____
    Amy L. Thomas
    Attorney for Defendant–Counterclaim Plaintiff
    Only One Hub d/b/a Primus Healthcare

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| VALUE DRUG COMPANY, | : |
| | : |
| *Plaintiff – Counterclaim Defendant,* | : Civil No. 3:23-cv-00263 |
| | : Judge Stephanie Haines |
| | : |
| v. | : |
| | : |
| ONLY ONE HUB INC. a/k/a | : |
| ONLY ONE HUB d/b/a | : |
| PRIMUS HEALTHCARE, | : |
| | : |
| *Defendant – Counterclaim Plaintiff,* | : |
| | : |
| and | : |
| | : |
| RICHARD HERSPERGER, | : |
| | : |
| *Defendant.* | : |

**<u>CERTIFICATE OF SERVICE</u>**

I, Amy L. Thomas, Esquire, Movant and Attorney for Defendant Only One Hub d/b/a Primus Healthcare in the above-captioned matter, hereby certify that on the 8th  day of August, 2024, I electronically filed a copy of the foregoing Answer, New Matter, and Counterclaims using the CM/ECF System, which will send notifications of such filing to the following:

Jennifer P. Richnavsky, Esquire
Steptoe & Johnson, PLLC
One PPG Place
Suite 3300
Pittsburgh, PA  15222
*Attorney for Value Drug Company*

I hereby certify that on August 8, 2024, I mailed by United States Postal Service, the document to the following non-registered participant:

Richard Hersperger
5575 Gulf Blvd., Unit 335
St. Pete Beach, FL  33706
*Defendant*

By:/s/Amy L. Thomas_____
Amy L. Thomas
Attorney for Defendant,
Only One Hub d/b/a Primus Healthcare